# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CHARLES D. ANDERSON,** | ) | |
| Plaintiff | ) | Civil Action No. 2:19cv00016 |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| **ANDREW SAUL,[1]** | ) | By: PAMELA MEADE SARGENT |
| **Commissioner of Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Charles D. Anderson, ("Anderson"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted as the defendant in this case.

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Anderson protectively filed his applications for DIB and SSI on September 18, 2014, alleging disability as of September 30, 2012,[2] due to arthritis; back problems; leg numbness; anxiety; "nerve problems;" depression; constant shakes and jitters; and right shoulder and elbow pain. (R. at 16, 234-35, 240-46, 288, 304, 316.) The claims were denied initially and upon reconsideration. (R. at 140-42, 145-47, 155-57, 159-61, 163-68, 170-72.) Anderson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 173-74.) The ALJ held a hearing on September 19, 2017, at which Anderson was represented by counsel. (R. at 41-78.)

By decision dated January 8, 2018, the ALJ denied Anderson's claims. (R. at 16-35.) The ALJ found that Anderson met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018. (R. at 18.) The ALJ found that Anderson had not engaged in substantial gainful activity since September 30, 2012, the alleged onset date. (R. at 18.) The ALJ determined that Anderson had severe impairments, namely lower back pain due to mild degenerative disc disease and radiculopathy, but he found that Anderson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1. (R. at 19, 22.) The

---

[2] The record shows that, despite alleging a disability onset date of September 30, 2012, Anderson continued to work part-time installing heating, ventilation and air conditioning, ("HVAC"), systems through March 2014. (R. at 46, 274, 290.)

ALJ found that Anderson had the residual functional capacity to perform light[3] work that did not require more than frequent overhead reaching with his right upper extremity and balancing; that required no more than occasional climbing, stooping, kneeling, crouching and crawling; and that required no more than occasional exposure to vibration. (R. at 23.) The ALJ found that Anderson was unable to perform any of his past relevant work. (R. at 33.) Based on Anderson's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Anderson could perform, including the jobs of a night cleaner, a packing line worker and a laundry worker. (R. at 34-35.) Thus, the ALJ concluded that Anderson was not under a disability as defined by the Act and was not eligible for SSI and DIB benefits. (R. at 35.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2019).

After the ALJ issued his decision, Anderson pursued his administrative appeals, (R. at 230-32), but the Appeals Council denied his request for review. (R. at 1-5.) Anderson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2019). This case is before this court on Anderson's motion for summary judgment filed September 3, 2019, and the Commissioner's motion for summary judgment filed November 4, 2019.

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2019).

## II.  Facts

Anderson was born in 1975, (R. at 234, 240), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Anderson has a high school education and vocational training in sheet metal work and auto body repair. (R. at 50.) He has past relevant work experience in the coal mining industry and in HVAC installation and repair. (R. at 45-46, 50-51.) Anderson testified that he used a cane to walk due to balancing problems. (R. at 56.) He stated that using a cane prohibited him from carrying any weight because it threw him off balance. (R. at 56.) Anderson testified that he had difficulty with fine manipulation due to a tremor. (R. at 57.) He stated that he did not take prescribed pain medication due to fear of addiction,[4] but instead took over-the-counter medication for his pain. (R. at 59, 63.) Anderson stated that he experienced panic attacks up to four times per week. (R. at 61.) He stated that, as a result of his anxiety and depression, he had difficulty being around people. (R. at 61-62.) Anderson testified that he could take care of his personal needs except for putting on his socks. (R. at 64.) He stated that he enjoyed drawing and painting pictures. (R. at 64.)

Asheley Wells, a vocational expert, was present and testified at Anderson's hearing. (R. at 68-77.) Wells classified Anderson's past work as an HVAC installer as medium,[5] skilled work. (R. at 69-70.) She stated that Anderson's past work in the

---

[4] Anderson has a history of substance abuse. (R. at 423, 427-28.)

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2019).

coal mining industry was medium, heavy[6] and very heavy,[7] unskilled, semi-skilled and skilled work. (R. at 70.) Wells was asked to consider a hypothetical individual of Anderson's age, education and work history, who had the residual functional capacity to perform light work that did not require more than frequent reaching overhead with his right upper extremity and balancing; that did not require more than occasional climbing, stooping, kneeling crouching and crawling; and that required no more than occasional exposure to vibration. (R. at 71.) Wells stated that such an individual would be unable to perform Anderson's past work, but that other jobs existed in significant numbers that such an individual could perform, including those of a night cleaner, a packing line worker and a laundry worker. (R. at 71-72.)

Wells then was asked to consider the same hypothetical individual, but who would be limited to sedentary[8] work. (R. at 72.) Wells stated that such an individual would be unable to perform Anderson's past work, but that other jobs existed in significant numbers that such an individual could perform, including those of an assembler, a weight tester and an addressing clerk. (R. at 72-73.) Wells stated that these jobs could be performed should the individual be limited to performing simple, routine tasks; making simple work-related decisions; responding appropriately to

---

[6] Heavy work is defined as work that involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, he also can do sedentary, light and medium work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2019).

[7] Very heavy work is defined as work that involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. If an individual can do very heavy work, he also can do sedentary, light, medium and heavy work. *See* 20 C.F.R. §§ 404.1567(e), 416.967(e) (2019).

[8] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2019).

occasional changes in a routine work setting; and to occasionally interacting with the public. (R. at 73.)

Wells next was asked to consider the first hypothetical individual, but who could less than occasionally[9] reach overhead bilaterally, perform bilateral foot pedal operations and perform repetitive and continuous stair climbing; who could never crouch, crawl and work around unprotected heights; and who could squat and kneel one-third of the workday. (R. at 74.) She stated that the hypothetical individual could perform the jobs cited in response to the first hypothetical. (R. at 74.) Wells stated that, if the individual had no use of his right upper extremity for handling more than eight pounds at a time and could not use his right upper extremity for repetitive and continuous functions, the jobs cited in the first hypothetical would be eliminated. (R. at 76.) She also stated that all jobs would be eliminated should the individual be limited as found in psychologist Paige Cordial's assessment. (R. at 76-77, 587-89.)

In rendering his decision, the ALJ reviewed records from Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Michael Cole, D.O., a state agency physician; Dr. Robert McGuffin, M.D., a state agency physician; Alan D. Entin, Ph.D., a state agency psychologist; Appalachia Family Health Center; Norton Community Hospital; Dr. Gregory Corradino, M.D.; Lonesome Pine Hospital, ("Lonesome Pine"); Park Avenue Medical Associates, ("Park Avenue"); Dr. D. Kevin Blackwell, D.O.; Norton Community Hospital; Holston Valley Medical Center, ("Holston Valley"); and Paige Cordial, Psy.D., a licensed clinical psychologist.

---

[9] Wells was asked to consider the opinion of Dr. Blackwell, who opined that Anderson should "avoid" certain tasks. (R. at 74, 474.) Wells was asked to assume that "avoid" meant "less than occasional." (R. at 74.)

Anderson reported that he had experienced chronic back pain since falling off the roof of a two-story house approximately 20 years ago. (R. at 362, 552.) He reported that, over the years, he tried physical therapy, narcotic pain medications and shots for his back pain with some limited relief. (R. at 362.) On June 3, 2005, a lumbar myelogram showed disc space narrowing at the L4-L5 level with a small anterior extradural defect; poor filling of the L5 nerve root sleeves bilaterally; and a small to moderate anterior extradural defect at the L3-L4 level with poor filling of the left L4 nerve root sleeves. (R. at 542-44.) On August 28, 2010, Anderson presented to the emergency department at Norton Community Hospital for complaints of back pain. (R. at 526, 528-30.) X-rays of Anderson's lumbar spine showed mild loss of the anterior vertebral body height at the T10-T11 level. (R. at 530.) Anderson was diagnosed with acute low back pain. (R. at 528.)

On September 20, 2011, Anderson established care at Park Avenue. (R. at 461.) Anderson reported chronic back pain, anxiety and insomnia. (R. at 461.) Anderson's physical examination revealed no cyanosis, clubbing or edema in his extremities; he had full range of motion of the cervical, thoracic and lumbar spine; his right sacroiliac joint was tender and "boggy" to palpation; he had full muscle strength in his upper and lower extremities; his gait, coordination and sensation were intact; his fine and gross motor movements were intact; and he had an appropriate mood and affect. (R. at 462.) Anderson was diagnosed with chronic low back pain, insomnia and anxiety. (R. at 462.) In October, November and December 2011, Anderson reported that his back pain and anxiety were controlled with medication. (R. at 457-59.) Anderson's physical examination revealed no cyanosis, clubbing or edema in his extremities; he had full range of motion of the cervical, thoracic and lumbar spine; he had full muscle strength in his upper and lower extremities; his gait, coordination and sensation were

intact; his fine and gross motor movements were intact; and he had an appropriate mood and affect. (R. at 457-59.)

On February 9, 2012, Anderson reported that his medications helped with his pain and his symptoms of anxiety. (R. at 456.) He stated that both his pain and anxiety levels were acceptable. (R. at 456.) An MRI of Anderson's lumbar spine was ordered. (R. at 456.) On March 9, 2012, Anderson reported that medication helped with his back pain, and he voiced no new complaints. (R. at 455.) On April 19, 2012, an MRI of Anderson's lumbar spine showed a bulging disc at the L2-L3 level; spondylitic change and a bulging disc at the L4-L5 level with narrowing of the central spinal canal, as well as neural foramina; and a tear in the annulus with a bulging disc at the L5-S1 level with narrowing of the neural foramina on both sides. (R. at 350, 463-64.) On May 2, 2012, Dr. Vijay Kumar, M.D., a physician with Park Avenue, reported that Anderson had full range of motion of the cervical, thoracic and lumbar spine; he had full muscle strength in the upper and lower extremities; his gait, coordination and sensation were intact; he had intact fine and gross motor movements; and he had a positive straight leg raising test on the right. (R. at 453.)

On August 7, 2012, Dr. Gregory Corradino, M.D., reported that Anderson's physical examination showed good strength in his legs with the exception of some very mild weakness of his right quadriceps; he had a trace to absent right patella reflex; and he had a slight decrease in sensation over the right anterior thigh, medial knee and right anterior lateral shin. (R. at 362.) Anderson was diagnosed with lumbar radiculopathy; herniated nucleus pulposus; degenerative disc disease of the lumbar spine; and low back pain. (R. at 361.)

From May 2012 through October 2014, Anderson was seen monthly at Park Avenue for his complaints of low back pain and anxiety. (R. at 423-53.) During this time, Anderson reported that his symptoms of anxiety were controlled with medication. (R. at 423-53.) Physical examinations showed full range of motion of the extremities with no deformities, edema or erythema; mild loss of lumbar lordosis; and lumbar tenderness and spasms. (R. at 423-33.) Dr. Kumar diagnosed displacement of a lumbar intervertebral disc without myelopathy; spinal stenosis of the lumbar region; generalized anxiety disorder; and muscle spasm. (R. at 423-33.)

On December 4, 2014, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Anderson suffered from a nonsevere anxiety disorder. (R. at 116-17.) He found that Anderson had no restrictions on his activities of daily living; he had mild difficulties in maintaining social functioning; he had no difficulties in maintaining concentration, persistence or pace; and he had experienced no repeated episodes of extended-duration decompensation. (R. at 117.)

On December 5, 2014, Dr. Michael Cole, D.O., a state agency physician, opined that Anderson had the residual functional capacity to perform light work. (R. at 118-20.) Dr. Cole found that Anderson was limited to frequent balancing and occasional climbing, stooping, kneeling, crouching and crawling. (R. at 119.) He opined that Anderson was limited to frequent reaching overhead with his right upper extremity. (R. at 119.) No visual or communicative limitations were noted. (R. at 119-20.) Dr. Cole found that Anderson should avoid concentrated exposure to vibration. (R. at 120.)

On June 20, 2015, Anderson presented to the emergency department at Lonesome Pine for complaints of back pain. (R. at 488-93.) His musculoskeletal examination showed normal range of motion and tenderness; he had tenderness in his lumbar back without swelling, deformity or spasm; he had normal strength, sensation and reflexes; and his mood, affect and behavior were normal. (R. at 490-91.) Anderson was diagnosed with bilateral low back pain. (R. at 491-92.)

On August 25, 2015, x-rays of Anderson's lumbar spine showed minimal degenerative changes compared to Anderson's August 30, 2010, x-rays. (R. at 348.)

On September 19, 2015, Dr. D. Kevin Blackwell, D.O., examined Anderson at the request of Disability Determination Services. (R. at 472-77.) Anderson complained of arthritis, anxiety and depression. (R. at 472.) Anderson's physical examination showed his extremities to be warm and dry with good turgor and color and no cyanosis or edema; he had tenderness at the lumbar musculature; his gait was symmetrical and balanced; his shoulder and iliac crest heights were good and equal bilaterally; his upper and lower joints had no effusions or obvious deformities; his upper and lower extremities were normal for size, shape, symmetry and strength; his grip strength was 5/5 and equal bilaterally; his fine motor movement and skill activities of the hands were normal; his reflexes in the upper and lower extremities were good and equal bilaterally; his proprioception was intact; and he had good mental status. (R. at 473-74.) Dr. Blackwell diagnosed multiple joint pains; bilateral shoulder, knee and elbow pain; chronic low back pain; and anxiety, by history. (R. at 474.)

Dr. Blackwell opined that Anderson could occasionally lift items weighing up to 30 pounds and frequently lift items weighing up to 20 pounds; he could sit six hours

in an eight-hour workday and stand one hour, assuming normal positional changes; he could not crouch, crawl or work around unprotected heights; he should avoid repetitive and continuous stair climbing; he could kneel up to one-third of an eight-hour workday; and he had no limitations of hand usage, including fine motor movement and skill activities. (R. at 474.) Dr. Blackwell's overall opinion, however, is unclear and vague, as he appeared to limit Anderson's bilateral overhead reaching, standing, bilateral foot pedal operation and squatting to "certain avoid amount of the day." (R. at 474.) Dr. Blackwell stated that these limitations were based on Anderson's subjective complaints. (R. at 474.)

On September 28, 2015, Anderson presented to the emergency department at Lonesome Pine for complaints of back pain. (R. at 494-500.) His musculoskeletal examination showed no edema; he had tenderness, pain and spasm in his lumbar back; he had normal coordination; and his mood, affect and behavior were normal. (R. at 496-97.) It was noted that Anderson became upset and began cursing, stating that he "only got a script for muscle relaxers." (R. at 564.) Anderson was diagnosed with left-sided low back pain and sciatica. (R. at 497.)

On September 30, 2015, Dr. Robert McGuffin, M.D., a state agency physician, opined that Anderson had the residual functional capacity to perform light work. (R. at 93-95.) Dr. McGuffin found that Anderson was limited to frequent balancing and occasional climbing, stooping, kneeling, crouching and crawling. (R. at 93-94.) He opined that Anderson was limited to frequent reaching overhead with his right upper extremity. (R. at 94.) No visual or communicative limitations were noted. (R. at 94.) Dr. McGuffin found that Anderson should avoid concentrated exposure to vibration. (R. at 94.)

On September 30, 2015, Alan D. Entin, Ph.D., a state agency psychologist, completed a PRTF, indicating that Anderson suffered from a nonsevere anxiety disorder. (R. at 103-04.) He found that Anderson had no restrictions on his activities of daily living; he had mild difficulties in maintaining social functioning; he had no difficulties in maintaining concentration, persistence or pace; and he had experienced no repeated episodes of extended-duration decompensation. (R. at 103.)

On May 3, 2017, Anderson established care with Appalachia Family Health because "his lawyer told him he needed to find [a] primary care provider." (R. at 511-13.) Anderson reported that he was trying to get disability for more than two years and had been turned down several times. (R. at 511.) Rebecca Mullins, F.N.P., a family nurse practitioner, did not conduct a physical examination, yet she diagnosed radiculopathy, lumbar region; anxiety disorder, unspecified; and major depressive disorder, single episode, unspecified, apparently based on Anderson's subjective complaints. (R. at 512-13.) On June 1, 2017, Anderson's examination showed that he had a normal gait, and he had proper orientation to time, place and person. (R. at 502.) Mullins diagnosed nicotine dependence; fatigue; type 2 diabetes mellitus; mixed hyperlipidemia; and low back pain. (R. at 502-03.)

That same day, Anderson was referred to Crystal Burke, L.C.S.W., a licensed clinical social worker with Appalachia Family Health, for his complaints of depression and anxiety. (R. at 516-19.) Anderson reported that he did not like to be around crowds of people. (R. at 516.) Burke reported that Anderson's mood was depressed with a sad affect; his thought process was intact; and his insight and judgment were deemed fair. (R. at 518.) Burke diagnosed major depressive disorder, single episode, severe, without psychotic features. (R. at 518.)

On June 22, 2017, Mullins completed a medical assessment, finding that Anderson would be limited to lifting and carrying items weighing up to 10 pounds occasionally and up to five pounds frequently; he could stand and/or walk four hours total in an eight-hour day, but could do so for 15 minutes without interruption; he could sit for three hours total in an eight-hour workday, but could do so for 15 minutes without interruption; he could never climb, stoop, kneel, balance, crouch and crawl; he had a limited ability to reach, to handle, to feel, to push and to pull; and he was restricted from working around heights, moving machinery, temperature extremes, humidity and vibration. (R. at 521-23.) Mullins based these findings on degenerative disc disease of the lumbar spine with radiculopathy. (R. at 522-23.) Mullins opined Anderson would miss more than two workdays monthly. (R. at 523.)

On July 24, 2017, Burke reported that Anderson ambulated with a cane. (R. at 574.) She reported that Anderson's mood was depressed with a dysphoric affect; his eye contact was appropriate; his thought process was intact; and his insight and judgment were deemed fair. (R. at 574-75.)

On September 5, 2017, Paige Cordial, Psy.D., a licensed clinical psychologist, evaluated Anderson at the request of Anderson's attorney. (R. at 578-85.) Cordial reported that Anderson walked with a cane and moved slowly and gingerly. (R. at 578.) Cordial reported that Anderson's mood was both depressed and anxious; his affect was congruent with his mood; he made poor eye contact and was somewhat shaky; he was dressed appropriately; he displayed no serious problems with concentration or memory; his speech was suggestive of linear and logical thought processes; and the rate, volume and tone of his voice were within normal limits. (R. at 578.) Anderson reported a history of drug and alcohol abuse, but stated that he was then-currently sober. (R. at 584.) The Beck Depression Inventory, Second Edition,

("BDI-II"), was administered, and showed that Anderson suffered from severe depressive symptomology. (R. at 584.) The Burns Anxiety Inventory, ("BAI"), was administered, and showed that Anderson suffered from severe anxiety. (R. at 584.) The PTSD Checklist for DSM-V, ("PCL-5"), was administered, and showed that Anderson had significant PTSD symptoms. (R. at 584.) Cordial diagnosed major depressive disorder, recurrent episodes, severe, without psychotic features; and generalized anxiety disorder with panic attacks. (R. at 585.) Cordial recommended that Anderson attend more regular counseling sessions to address his anxiety and depressive symptoms. (R. at 585.)

On September 11, 2017, Cordial completed a mental assessment, indicating that Anderson had slight limitations in his ability to follow work rules; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 587-89.) She found that Anderson had a satisfactory ability to relate to co-workers; to use judgment in public; to interact with supervisors; to function independently; to maintain attention and concentration; and to understand, remember and carry out detailed job instructions. (R. at 587-88.) Cordial opined that Anderson had a seriously limited ability to deal with the public; to deal with work stresses; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 587-88.) Cordial opined that Anderson could manage his own funds and that he would be absent from work more than two days a month. (R. at 589.)

*III.  Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Anderson argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) In particular, Anderson argues that the ALJ erred by failing to give controlling weight to the opinions of Dr. Blackwell,

nurse practitioner Mullins and psychologist Cordial, and by giving controlling weight to the opinions of the state agency consultants. (Plaintiff's Brief at 6.) Anderson contends that the state agency consultants' assessments were "stale [and] outdated." (Plaintiff's Brief at 6.)

The ALJ found that Anderson had the residual functional capacity to perform light work that did not require more than frequent overhead reaching with his right upper extremity; that required no more than occasional climbing, stooping, kneeling, crouching and crawling; that required no more than frequent balancing; and that required no more than occasional exposure to vibration. (R. at 23.)

In making this residual functional capacity finding, the ALJ stated that he was giving "little weight" to the opinions of Dr. Blackwell, Mullins and Cordial. (R. at 30-31.) The ALJ stated that he was giving Dr. Blackwell's opinion little weight because it often was unclear and vague, such as when he described Anderson's limitations in terms of a "certain amount of the day." (R. at 30.) In addition, the ALJ noted that Dr. Blackwell examined Anderson on one occasion in 2015, and he did not have access to medical records after September 2015. (R. at 30.) The ALJ found that Anderson's statements to Dr. Blackwell, such as his main health problem being rheumatoid arthritis,[10] were inconsistent with the medical treatment records, and Dr. Blackwell appeared to rely on Anderson's statements in making his diagnoses. (R. at 30.) The ALJ also stated that he was giving Mullin's medical assessment "little weight" because it was too restrictive based on the medical evidence of record. (R. at 30.) *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (2019) (providing for more weight where an opinion is consistent with the record as a whole).

---

[10] The court notes that Dr. Blackwell specifically stated that Anderson "has had no diagnosis for rheumatoid arthritis." (R. at 478.)

As noted by the ALJ, while Dr. Blackwell opined that Anderson had the residual functional capacity to perform a limited range of light work, his restrictions are unclear and vague, such as when he described Anderson's limitations in terms of a "certain amount of the day." (R. at 30, 480.) In addition, Mullins found that Anderson had the residual functional capacity to perform a limited range of sedentary work after performing only one physical examination of Anderson in June 2017. (R. at 501-10, 521-23.) In June 2017, Mullins noted that Anderson's physical examination showed that he was well-nourished, well-developed and in no acute distress, with a normal gait and no other musculoskeletal findings. (R. at 502.)

Furthermore, Anderson's physical examinations from 2011 through 2017, including Dr. Blackwell's and Mullins's examinations, revealed no cyanosis, clubbing or edema in his extremities; he had full range of motion of the cervical, thoracic and lumbar spine; he had full muscle strength in his upper and lower extremities; his gait, coordination and sensation were intact; his fine and gross motor movements were intact; and he had an appropriate mood and affect. (R. at 453, 457-59, 462, 490-91, 502.) While it was noted in June and September 2015 that Anderson had tenderness and spasm in his lumbar back, he had normal range of motion, gait, coordination, strength and sensation. (R. at 473-74, 490-91, 496-97.) X-rays of Anderson's lumbar spine, performed in August 2015 showed minimal degenerative changes as compared to his August 2010 lumbar spine x-rays, which showed mild loss of the anterior vertebral body height at the T10-T11 level. (R. at 348, 530.) As noted by the ALJ, Anderson admitted that he established care with Mullins after his attorney told him that he needed to find a primary care provider. (R. at 511.)

The ALJ gave "little weight" to Cordial's assessment because it was inconsistent with the mental evidence of record. (R. at 31, 587-89.) The ALJ noted Cordial was not a treating source, but examined Anderson only once at his counsel's referral, solely for the purpose of gathering information for his disability case, not for treatment purposes. (R. at 31.) This is a factor to be considered when deciding the weight to give to Cordial's opinion. *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) (2019) (stating the longer the source has treated claimant and the number of times the source has seen the claimant is a factor in deciding the weight to assign a medical opinion); *see also Mefford v. Berryhill*, 2018 WL 7550260, at *8 (W.D. Va. Oct. 11, 2018) (citing *Holman v. Astrue*, 2012 WL 2678933, at *7 (M.D. Tenn. May 31, 2012) ("Because Dr. Blevins only examined Plaintiff one time, at the request of his attorney, specifically for the purposes of determining Plaintiff's ability to perform work-related activities, and because his findings were inconsistent with the [other substantial evidence of record], the ALJ properly accorded little weight to Dr. Blevins' opinion.")); *Hayes v. Astrue*, 2010 WL 1904965, at *8 (W.D. Va. May 12, 2010) (while "referral by counsel and a one-time examination are not grounds, in and of themselves, to reject an examiner's opinion, they are relevant factors to consider"). In addition, while Anderson reported that he suffered from anxiety and depression since 2011, it was noted that his condition was well-controlled with medication, and it was routinely reported that he had an appropriate mood and affect. (R. at 423-453, 456-59, 462, 491, 497.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ gave "significant weight" to the state agency consultants' opinions who found that Anderson had the residual functional capacity to do a limited range of light work. (R. at 29, 93-95, 103-04, 116-120.) The ALJ is entitled to rely on a

nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (2019).

Anderson argues that the ALJ should have given the state agency physicians' assessments less weight because they were "stale [and] outdated." (Plaintiff's Brief at 6.) It is noted that Dr. Cole's assessment was rendered in December 2014, and Dr. McGuffin's assessment was rendered in September 2015, just 11 days after Dr. Blackwell's assessment. (R. at 93-95, 118-20, 474.) It also is noted that Leizer's assessment was rendered in 2014, and Entin's assessment was rendered in 2015, both finding that Anderson did not suffer from a severe mental impairment. (R. at 103-04, 116-17.) The record shows that Anderson did not start seeing a counselor until June 2017, just months prior to his September 2017 hearing date. "The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *see also Stricker v. Colvin*, 2016 WL 543216, at *3 (N.D. W. Va. Feb. 10, 2016) ("[A] lapse of time between State agency physician opinions and the ALJ's decision does not render the opinion stale.")

It is apparent from the ALJ's very thorough decision that he carefully evaluated the whole record before him when weighing the opinion evidence, and he ultimately found the state agency medical opinions were consistent with the record as a whole. Based on this, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his finding that Anderson had the residual functional capacity to perform a limited range of light work.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's residual functional capacity finding;

2.  Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence; and

3.  Substantial evidence exists in the record to support the Commissioner's finding that Anderson was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Anderson's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by

the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    May 28, 2020.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE